Filed 4/2/15  P. v. Reed CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICKEY THOMAS REED,<br><br>    Defendant and Appellant. | A135971<br><br>(Contra Costa County<br>Super. Ct. No. 5-090749-3) |

Defendant Rickey Thomas Reed was convicted by a jury of 13 felony counts for repeatedly sexually assaulting his 13-year-old niece, including five counts of committing a lewd act upon a child, aggravated sexual assault of a child by oral copulation and a foreign object, kidnapping to commit a lewd act, false imprisonment, and providing methamphetamine to a minor.  Reed raises 10 issues on appeal.  He contends the trial court erred by admitting evidence of two prior sexual offenses pursuant to Evidence Code sections 1101 and 1108[1] and that section 1108 is unconstitutional on its face and as applied.  He raises issues with several jury instructions: CALCRIM Nos. 220, 371, 375, and 1191 (as it relates to 224).  He contends the court improperly excluded portions of his prison letters under section 356.  He asserts the trial court erred in allowing a police officer to testify about his experience interviewing child victims.  Lastly, he objects to his sentence as improper under Penal Code section 654 and as cruel and unusual punishment.  We modify the sentence on count four but otherwise affirm the judgment.

---

[1]Further statutory references are to the Evidence Code unless otherwise designated.

## BACKGROUND

Jane Doe was sexually molested by her uncle, defendant Rickey Reed, on two separate dates in 2008. The first incident occurred at Reed's father's home on Bonnie Lane when Jane was 13 years old. Reed told Jane's grandmother (his mother) that he was taking Jane to visit her cousin, but instead took her to Bonnie Lane. When they got to the house, Reed asked Jane if she had ever consumed alcohol and she said no. Reed gave her a wine cooler and had her try another alcoholic "ice" beverage. They were watching TV and Reed put in a DVD that Jane described as a "porno." Reed then put a sheet down on the floor in front of the couch and asked Jane if she wanted a massage. Jane lied down on the sheet on her stomach and Reed began to massage her. Jane began to feel uncomfortable and she was dizzy from the wine coolers. Reed then put his hands under Jane's bra on the front of her chest causing Jane to "jump" and get up. Reed said he was sorry and it would never happen again. Jane told him that she wanted to go home. Jane did not tell her grandmother about the incident because she was afraid her grandmother would be mad at her.

The second incident occurred several weeks later. Jane's dog had puppies and Reed had found homes for two of them. Jane went with him to deliver the puppies, and Reed later took Jane to his house. He told her that he needed to use the bathroom or wanted to get a glass of water. Jane said she would wait in the car, but ultimately went into the house with Reed and he pulled out a bag of methamphetamine. He told her it was better than marijuana and it would make her feel good. Reed had a candle and foil and put the meth on the foil. He gave Jane a rolled up bill and told her to inhale the smoke. The meth made Jane feel dizzy, tingly, and off balance. Jane lay down on the couch because she was not feeling well and the next thing she remembered her pants were off. Reed was in the kitchen naked.

Reed approached Jane and began licking Jane's genital area. Reed then put a sheet down on the floor and tried to have intercourse with Jane. He put his hands on both her knees and tried to push his penis inside her and she tried to push him away. Jane crawled away and Reed put her in the bathtub. Reed grabbed a razor and began to

2

painfully shave Jane's pubic area. Reed rubbed Vaseline on Jane and again tried to insert his penis into her vagina. Reed also tried to put Jane's mouth on his penis. Reed put the shower head against Jane's body with the water "going inside" her. Reed then masturbated and ejaculated on Jane.

At some point during the attack, Reed put a latex glove over a broom handle and inserted it into Jane's vagina multiple times, hurting her. Jane saw blood and was scared.

Jane went to the front door to leave the house, but she was naked and did not know where her clothes were. Jane's grandmother called the house and was yelling because Reed had not brought Jane home on time. Reed instructed Jane to "rinse off" and took Jane home. When she got there, Jane's grandmother began yelling at her and hitting her, and Jane told her grandmother what happened. Jane's grandmother took her to her cousin Marisa's house. The next day Marisa's mother took Jane to the hospital.

A nurse and emergency room doctor gave Jane a sexual assault examination. The nurse noted bruises on Jane's shins, arms and the inner part of her knee. Jane had a razor rash and shaved patches in her pubic area and she had redness, tearing on her vaginal wall and swelling on her labia. Jane had "very traumatic" injuries running the length of her vagina that were consistent with penetration with a foreign object. The doctor testified that she does not recall ever seeing similar injuries in another patient. The sexual assault nurse similarly testified that she had rarely seen internal vaginal injuries of the kind on Jane Doe.

During the police search of the house, the officers found a razor consistent with Jane Doe's description and pubic hair in the tub drain. They found a mop or broom handle on the floor of the rear bedroom and two packages of latex gloves. One glove was missing from the one opened package of gloves. They found a damp towel in the washing machine that appeared to have blood on it. A DNA Analyst confirmed the stains on the towel were Jane Doe's blood and sperm that matched Reed's DNA. From Jane Doe's sexual assault kit, the analyst found male DNA on the swab from her nipple. Given the nature of the sample, he could not "match" the DNA, but concluded that the odds of it not being Reed were roughly 1 in 1.2 billion Caucasians.

3

Reed was wearing a GPS tracking device on the day of the second assault.  A representative from Satellite Tracking of People testified that Reed was at the Bonnie Lane house from 4:20 p.m. to 8:50 p.m. that day.  She also testified that Reed tried to tamper with or remove the device multiple times during that time period.

Reed was charged with 13 felony counts: five counts of committing a lewd act on a child in violation of Penal Code section 288, subdivision (a); kidnapping to commit a lewd act upon a child in violation of Penal Code section 207, subdivision (b); assault with the intent to commit a lewd act upon a child in violation of Penal Code section 220, subdivision (a); oral copulation of a child in violation of Penal Code section 288a, subdivision (c)(1); aggravated sexual assault of a child by forcible oral copulation in violation of Penal Code section 269, subdivision (a)(4); aggravated sexual assault of a child by penetration with a foreign object in violation of Penal Code section 269, subdivision (a)(5); sexual penetration of a drugged person in violation of Penal Code section 289, subdivision (e); false imprisonment by violence in violation of Penal Code section 236 and 237, subdivision (a); and furnishing methamphetamine to a minor in violation of Health and Safety Code section 11380, subdivision (a).

The jury convicted Reed of all charges.  The court found true Reed's prior convictions for sex offenses and sentenced Reed to an indeterminate term of 495 years to life plus a consecutive determinate term of 19 years and four months.

DISCUSSION

A.     The Decision to Admit Evidence of Reed's Prior Sex Offenses

The prosecution filed a pretrial motion to introduce evidence of Reed's prior sexual offenses under section 1108.  The prosecution sought to introduce five prior instances: (1) a 1989 misdemeanor indecent exposure conviction; (2) a 1989 felony indecent exposure conviction (Celia M. incident); (3) a 1995 felony conviction for lewd acts upon a child (Alexis L. incident); (4) a 1999 investigation for molestation of a 10-year-old girl; and (5) a 2000 felony indecent exposure conviction.  The prosecution argued that these prior acts demonstrated Reed was an "opportunistic sexual offender who preys on young, vulnerable female victims."  Reed opposed on the grounds that

4

Evidence Code section 1108 violated the due process clause of the Constitution and that the evidence must be excluded as too inflammatory and prejudicial.

After evaluating the relevant factors, including the nature of the current offense, remoteness in time, degree of certainty in the commission of the prior offenses, similarity, the burden on Reed to defend against the prior offense, and possible confusion or distraction, only two of the five incidents were ruled admissible.

At trial, Celia M. testified that in 1989 she saw Reed parked on the side of the road. He was naked, blowing kisses and masturbating. She flagged down a police officer and provided a detailed statement. Detective Willett testified that after Reed was taken into custody for indecent exposure, he stated that when he used methamphetamine, he had "the urge to exhibit himself sexually." Reed said he liked to expose his penis and masturbate in public in front of women. Reed also stood up during the police interview and displayed an erection and bragged about the size of his penis.

Alexis L. was Reed's niece and would have sleepovers at his house. She testified that when she was seven or eight years old, Reed molested her three to five times. The first time Reed molested her, he pulled down Alexis L.'s underwear and put his mouth on her genital area. Reed would put Vaseline or baby oil on himself and masturbated in front of her and touched her with his penis. He also put his fingers into her vagina. Reed instructed her not to tell anyone and would put money under her pillow.

The court found that the Alexis L. incident was "the most like the current charge" because the crime occurred in Reed's home, with his seven year old niece, and there was touching, masturbating then digital penetration. Further, Reed moved Alexis L. from room to room. The court also noted the process of grooming a younger relative that was similar to the present case.

The Celia M. incident, while different in kind, was considered by the court to be "highly probative" of Reed's use of methamphetamine and the connection of its use to his sexual urges. This case too involved Reed's use of methamphetamine and it's administration to Jane Doe before the abuse. In the Celia M. case, Reed admitted that

5

when he used methamphetamine, he got the urge to expose himself. The court considered this incident evidence of Reed's intent and motive.

The court found that the Alexis L. and Celia M. offenses would also be admissible under section 1101, subdivision (b) for Alexis L. as to intent and absence of mistake and for Celia M. as to motive and absence of mistake.

The court did not believe the prior incidents were unduly prejudicial because they were "not anything near the severity of what the defendant is facing" in this case. "And the thing about the remoteness here is that [it] would probably seem old, 1989, but for the fact that the defendant has spent most of his intervening time in custody." The court found that both incidents had resulted in convictions.

Section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) allows evidence of a crime, civil wrong, or other act to prove a fact other than predisposition to commit crimes, such as motive, intent, common plan, or identity.

Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Reed makes three arguments about the evidence of the incidents involving Celia M. and Alexis L.: (1) section 1108 is unconstitutional on its face and as applied; (2) the trial court erred in admitting the evidence under sections 1108 and 352; and (3) the error was so prejudicial that it requires reversal of his conviction.

6

*The Constitutionality of Evidence Code Section 1108*

The California Supreme Court has held that Evidence Code section 1108 is constitutional in the face of both due process and equal protection challenges. (*People v. Falsetta* (1999) 21 Cal.4th at 907, 916–922 [no due process violation]; see *People v. Fitch* (1997) 55 Cal.App.4th 172, 182–184 [no equal protection violation].) "[B]ecause of the protections written into Evidence Code section 1108, there [is] no undue unfairness in the statute's limited exception to the historical rule against the use of propensity evidence." (*People v. Manning* (2008) 165 Cal.App.4th 870, 878.) As we will discuss, Reed has not shown that the admission of evidence pursuant to section 1108 violated his due process or equal protection rights, as applied, by making his trial fundamentally unfair. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 995.) Therefore, we reject the challenge to the constitutionality of section 1108.

*Admissibility of the Prior Sex Convictions at Trial*

Reed argues that the two prior sex crimes were not similar and were used to unfairly characterize him as a "meth sex maniac." For Alexis L., Reed concedes that "a single lewd act offense involving Alexis was admissible for propensity only," but multiple acts should not have been admitted. He argues that the testimony should have been excluded because Alexis L. was a child, but Jane Doe had gone through puberty. The locations of the offenses were dissimilar, and the charged conduct involving Jane Doe was substantial sexual contact and not mere touching as it was with Alexis L. Reed argues the conduct involving Celia M. was dissimilar because she was an adult, the offense occurred on a public street, and there was no sexual contact.

Generally, Reed contends that the prior crimes evidence was inflammatory and made him appear as a wanton predator when he used drugs. He says the events were also too remote in time. Reed relies on *People v. Earle* (2009) 172 Cal.App.4th 372 to support his argument that both crimes are too dissimilar to be admissible. In *People v. Earle*, the court held that a prior uncharged indecent exposure did not support an inference that defendant had committed rape. (*Id.* at p. 398.) "In order for evidence of another crime to be relevant under section 1108, it must have some tendency in reason to

7

show that the defendant is predisposed to engage in conduct *of the type charged.*" (*Id.* at p. 397).

But, both incidents met this test. The Celia M. incident shows Reed was predisposed to engage in inappropriate sexual conduct after using methamphetamine and the Alexis L. incident demonstrates Reed's predisposition to victimize young female family members.

The Alexis L. incident is also proof of propensity as well as intent and absence of mistake. The prosecution showed that Reed had attempted to groom his nieces so he could commit acts of sexual abuse against them. Both nieces were victimized in Reed's "home" when the girls were asleep or unconscious. Both involve Reed touching and licking their genitals while masturbating and using some form of lubricant. The evidence was also relevant to Reed's intent and plan because he victimized his nieces when they were vulnerable and isolated in his own home.

On its face, the Celia M. incident does not have a high degree of similarity to the charged crimes. Reed's public exposure to an adult woman is not the same type of conduct charged here. In *People v. Escudero*, the court held that evidence of a defendant's sexual assaults against two adult women was admissible under section 1108 at his trial for committing lewd acts on a seven-year-old child. (*People v. Escudero* (2010) 183 Cal.App.4th 302, 306.) "[T]he evidence demonstrated that defendant took advantage of vulnerable females regardless of their ages, sexually assaulting them when it was particularly risky to do so." (*Ibid*.) Moreover, "[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (*Id.* at p. 311, quoting *People v. Frazier* (2001) 89 Cal.App.4th 30, 40–41.)

The fact that the Celia M. incident involved different behavior directed at mature women merely goes to the weight of the evidence rather than its admissibility. The Celia M. conviction was not admitted simply to show Reed's prior lewd sexual conduct. It was

8

introduced to show Reed's propensity to commit sexual acts while using methamphetamine. Reed was charged with providing Jane Doe methamphetamine and using it himself prior to abusing her. In the Celia M. case, Reed admitted that methamphetamine fueled his sexual appetite. Detective Willett testified that Reed stated that when he used methamphetamine, he had "the urge to exhibit himself sexually." Under these circumstances, the Celia M. offense was admissible to show Reed's propensity to commit sexual offenses while using methamphetamine as well as his motive and intent in giving methamphetamine to Jane.

We review the trial court's choice to admit prior incidents under section 352 for abuse of discretion. (*People v. Harris* (1998) 60 Cal.App.4th 727, 736–37.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*People v. Foster*, (2010) 50 Cal.4th 1301, 1328–1329 citing *People v. Hovarter* (2008) 4 Cal.4th 983, 1004.)

We look to four factors, balancing the probative value of the evidence against undue prejudice, delay or confusion. They are: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of the uncharged offenses. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

First, the trial court found that the prior incidents were "not anything near the severity of what the defendant is facing" in the current case and thus not more inflammatory than the charged offenses at trial. It is not likely that the jury would have been unduly prejudiced by the testimony about the Alexis L. or Celia M. incidents. The Alexis L. incident was similar in nature, although far less egregious, than the charged conduct in this case and the Celia M. incident was less severe.

Second, there is no indication that the prior acts evidence created confusion for the jury. Both prior acts resulted in felony convictions, rather than uncharged conduct. The

9

jury was not required to determine if the uncharged acts did, in fact, occur. The jury only needed to evaluate whether the prior acts were relevant to establish propensity. The jury asked no questions about the prior convictions and did not request any read-back of testimony regarding those incidents, providing no support for Reed's argument that this evidence created confusion.

Third, the trial court found that "the thing about the remoteness here is that [it] would probably seem old, 1989, but for the fact that the defendant has spent most of his intervening time in custody." There are no specific time limits for determining when an uncharged offense is so remote as to be inadmissible. (*People v. Branch, supra*, 91 Cal.App.4th at p. 284, citing *People v. Harris, supra*, 60 Cal.App.4th at p. 739.) Courts have found as much as a 30-year gap in time was not too remote when the offenses were similar. (*Ibid.* [finding a 30 year gap not too remote where appellant first molested a 12-year-old stepdaughter, then a 12-year-old step-great-granddaughter by taking advantage of the fact that each victim was staying in his home].)

Lastly, the amount of time involved in presenting the evidence to the jury was limited. The trial in this case lasted from May 21 to June 1, 2012, over the course of seven court days. There were more than 900 pages of trial transcript. The prior sex crimes evidence totaled approximately 68 pages of testimony from six witnesses. We do not consider this substantial trial time devoted to the prior acts. (See *People v. Branch, supra*, 91 Cal.App.4th at p. 285–286.)

Under section 352, evidence should be excluded where the probative value is "substantially outweighed" by the "probability" that its admission will create a "substantial" danger of "undue" prejudice. Here, the probative value of the uncharged offenses was high and the danger of undue prejudice was slight.

### *Even If the Court Erred, the Evidence Did Not Deny Reed a Fair Trial*

Even if the court erred in admitting the evidence of the prior sex convictions, any error was harmless and does not require reversal. Reed contends that we must apply the harmless-beyond-a-reasonable-doubt test for errors that violate the United States Constitution (*Chapman v. California* (1967) 386 U.S. 18, 24), while the People argue for

10

the reasonable-probability test (*People v. Watson* (1956) 46 Cal.2d 818, 836–837) that applies to error under California law. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 360 [applying the *Watson* standard to the erroneous admission of unduly prejudicial sexual offense propensity evidence].) We need not resolve the issue because we conclude that any error was harmless under either standard.

The prosecution's case primarily presented the testimony of Jane Doe. Both before the jury and in the videotape of her Children's Interview Center meetings[2] her testimony was detailed and consistent. Jane Doe's testimony was corroborated by the emergency room physician and sexual assault nurse who described "very traumatic" and unusual injuries to her vagina. There was also corroborating physical evidence at the Bonnie Lane house. The police found a towel with Jane's blood and Reed's DNA in the washing machine, the broom handle, a box of latex gloves missing one glove, and a razor and pubic hair in the bathtub. Reed's letters from prison further corroborated Jane Doe's testimony that he smoked methamphetamine with her at the time of the crimes.

Reed argues that this was a credibility case where the jury "needed to decide whether [Jane] was experimenting with drugs, alcohol, piercing, shaving and her own meth-induced masturbation" and the introduction of the prior offenses under the prosecution's "meth-sex-maniac theory" prevented any fair chance of the jury weighing the evidence. But there is no reasonable probability the jury would have reached a result more favorable to Reed even if the court excluded the prior sex acts. The testimony of the emergency room medical staff disproved the defense theory that Jane's injuries were self-inflicted as did the DNA evidence. Finally, as we have stated, the prior convictions were less serious than the charged offenses and therefore would not likely have inflamed the jury. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1332 [finding admission of defendant's prior crimes was harmless error].) Therefore, any error in admitting the prior acts evidence was harmless beyond a reasonable doubt.

---

[2]On May 9, 2008 and May 20, 2008, Jane met with a counselor at the Children's Interview Center and these videotaped meetings were played for the jury.

B.     CALCRIM No. 375

Reed contends that the trial court erred in instructing the jury about section 1101 pursuant to CALCRIM No. 375 because the instruction included reference to a common plan or scheme.  As outlined above, the prior acts evidence was admitted to show propensity under section 1108 and to establish intent, motive or absence of mistake under section 1101.  The court did not specifically address plan or scheme when it ruled those acts admissible.

The court instructed the jury to consider the evidence regarding Celia M. and Alexis L. for the limited purpose of deciding whether or not:

> The defendant acted with intent to commit a lewd and lascivious act on a child in this case; or
> The defendant had a motive to commit the offense alleged in this case; or
> The defendant's alleged actions were the result of mistake or accident; or
> The defendant had a plan or scheme to commit the offenses alleged in this case.

Reed argues this instruction was error because there was no evidence the prior sex crimes demonstrated a plan or scheme.

Reed's failure to object to this instruction forfeits his claim on appeal.  (*People v. Valdez* (2004) 32 Cal.4th 73, 113.)  Nevertheless, we will address the issue on the merits as it relates to Reed's ineffective assistance of counsel claim.  We conclude that the jury instruction was proper because there was sufficient evidence of a plan or scheme before the jury.

"[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)  In *People v. Ewoldt*, the court found that prior, uncharged lewd acts upon the victim's sister were admissible pursuant to section

12

1101 to show that the charged offenses were committed according to a similar design or plan. (*Ibid.*) The victim's sister, Natalie, testified that when she was 10 or 11 years old she awoke on three occasions to find the defendant beside her bed touching her breasts and genitals. (*Id.* at p. 389.) The victim testified that the defendant molested her from the time she was six or seven years old until she was 14 years old. The defendant twice forced her onto the bed and attempted to force her legs apart. The defendant also twice entered her room in the middle of the night, touched her and asked her to touch his penis. (*Id.* at pp. 388–389.) The court found both Natalie and the victim were the defendant's step-daughters, they both lived in the defendant's home, and the acts occurred when they were of similar age. (*Id.* at p. 403.) The court held that the uncharged acts and the current offense shared sufficient common features to support a common design or plan. (*Ibid.*)

The Alexis L. incident shares sufficient common features with Reed's abuse of Jane Doe to be admissible as a common scheme or plan. Both victims were Reed's nieces; both were victimized when they were vulnerable: Alexis L. at night while others were sleeping and Jane Doe while she was alone with Reed. Both were initially victimized while asleep or unconscious, both were in Reed's "home," and both girls were children. The Alexis L. incident supports the inference that Reed had a plan when he brought Jane Doe, alone, to the Bonnie Lane house. The " 'common scheme or plan' exception thus contemplates a recurring criminal *pattern,* such as a repeated strategy or modus operandi, by which the defendant perpetrates multiple distinct crimes." (*People v. Whitmer* (2014) 59 Cal.4th 733, 760.)

Finally, the evidence was relevant at trial because Reed argued that Jane Doe was experimenting with drugs and caused her injuries through her own masturbation. The fact that Reed had used a similar design or plan with Alexis L. supports an inference that this version of events was not true.

### Ineffective Assistance of Counsel

Defense counsel's failure to object to the inclusion of the scheme or plan language in the jury instruction does not constitute ineffective assistance of counsel.

13

To establish ineffective assistance of counsel, a "defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant." (*People v. Stanley* (2006) 39 Cal.4th 913, 954 citing *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*People v. Stanley, supra*, at p. 954.)

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " ' " (*People v. Stanley, supra,* 39 Cal.4th at p. 954 citing *People v. Weaver* (2001) 26 Cal.4th 876, 925–926.) Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts. (*People v. Stanley, supra*, at p. 954.)

Here, counsel could have made a reasonable tactical decision that the evidence was coming in under section 1108 for propensity and section 1101 for motive, intent and absence of mistake. In the circumstances counsel could conclude there was no benefit to raising an additional objection to the plan or scheme language in the jury instruction. "Whether to object to arguably inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference, failure to object seldom establishes counsel's incompetence." (*People v. Maury* (2003) 30 Cal.4th 342, 415–416 citing *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1121.)

On this record, we do not know why counsel acted or failed to act. "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury, supra*, 30 Cal.4th at p. 389.) Further, Reed cannot show prejudice because the evidence was properly admitted on other grounds, had a bearing upon a plan

14

or scheme and he cannot demonstrate the result of the trial would have been different but for counsel's failure to object to the plan or scheme portion of the jury instruction.

C.      CALCRIM Nos. 1191 and 224

The court instructed the jury with the following modified version of CALCRIM No. 1191:

> The People presented evidence that the defendant committed the crimes of indecent exposure and lewd and lascivious acts upon a child under the age of 14 that were not charged in this case. These crimes are defined for you in these instructions.
>
> You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> If the People have not met this burden of proof, you must disregard this evidence entirely.
>
> If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit . . . . [the charged offenses]. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the offenses listed above. The People still must prove each charge and allegation beyond a reasonable doubt.
>
> Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility.

The trial court also instructed the jury pursuant to CALCRIM No. 224: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."

15

Here, Reed contends that instructing the jury under CALCRIM 1191 that it could find he committed the prior uncharged offenses by a preponderance of the evidence conflicted with the requirement in CALCRIM 224 that facts supporting a conclusion based upon circumstantial evidence must be proved beyond a reasonable doubt. He says that the two instructions given together permit the jury to have convicted him on a reduced burden of proof. We disagree.

Reed's counsel did not object to either instruction. Counsel's failure to object to the jury instruction at trial has forfeited the claim, (See *People v. Valdez, supra,* 32 Cal.4th at p.113.), but the claim also fails on its merits.

In *People v. Reliford* (2003) 29 Cal.4th 1007, our Supreme Court held that a prior version of CALCRIM 1191 did not mislead jurors on the limited consideration they could give other crimes evidence or the prosecution's burden to prove the elements of a crime beyond a reasonable doubt. "Although the instruction considered in *Reliford* was the older CALJIC No. 2.50.01, there is no material difference in the manner in which each of the instructions allows the jury to conclude from the prior conduct evidence that the defendant was disposed to commit sexual offenses and, therefore, likely committed the current offenses." (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480; *People v. Wilson*, (2008) 166 Cal.App.4th 1034, 1049 quoting *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87 [" 'The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to . . . CALCRIM No. 1191 . . . in its explanation of the law on permissive inferences and the burden of proof.' " ]; see *People v. Anderson* (2012) 208 Cal.App.4th 851, 895–896 [reaching the same conclusion concerning the 2008 version of CALCRIM No. 1191].)

*People v. Reliford* addressed each of the arguments Reed makes here, holding that "no juror could reasonably interpret the instructions to authorize conviction of a charged offense based solely on proof of an uncharged sexual offense." (*People v. Reliford*,

16

*supra*, 29 Cal.4th 1007 at p. 1015.)[3]  The court specifically rejected the notion that instruction requiring different burdens of proof be applied to different matter presented for the jury's consideration was too complicated.  "This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial."  (*Id.* at p. 1016; see also *People v. Virgil*  (2011) 51 Cal.4th 1210, 1259–1260 [rejecting a similar challenge to  CALJIC 2.50 which allowed the jury to consider evidence of uncharged conduct to establish identity or intent once they found the other crimes evidence was proved by a preponderance of the evidence].)

D.      Reed's Letters From County Jail

Section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Evid. Code § 356.)

The purpose of section 356 is to avoid creating a misleading impression.  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  "It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced."  (*People*

---

[3]Reed argues that *People v. Reliford* and subsequent cases did not address the specific language in CALCRIM No. 1191 that if you "decide that the defendant committed the uncharged offenses . . . you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and *did commit* . . . .[the charged offenses]."  Yet, the instructions in *Reliford*, *Wilson*, and *Cromp* all contain similar "did commit" language as used here.  (*People v. Reliford* , *supra*, 29 Cal.4th 1007 at p. 1012; *People v. Cromp, supra,* 153 Cal.App.4th at p. 480; *People v. Wilson*, supra, 166 Cal.App.4th at p. 1049.)  Reed relies on the bench notes to CALCRIM No. 1191 which identify one decision that criticizes the "did commit" language in a footnote, (*People v. James* (2000) 81 Cal.App.4th 1343, 1357, fn. 8), and advises a court to review the commentary section.  *People v. James*, however, involved the 1997 version of CALJIC No. 2.50 and not the revised language approved in later cases.

*v. Samuels* (2005) 36 Cal.4th 96, 130.)  Statements about other matters may be properly excluded.  (*Ibid*. citing *People v. Williams* (1975) 13 Cal.3d 559, 565.)

In anticipation that the prosecution would seek to introduce evidence from Reed's letters written from county jail, he moved in limine before trial to introduce all evidence necessary to make the letters "fully understood."  The prosecution also had a general motion before the court to preclude admission of any evidence regarding penalty, punishment, custodial status or time in custody.  When the motions were heard, the court advised defense counsel that Reed could address the content of the letters if he testified and that counsel could ask the court to revisit the issue at that time.  The court instructed counsel that if he felt there were additional sections of the letters that he wanted to admit under section 356, to bring it to the court's attention.

Parts of two such letters written by Reed from county jail were admitted into evidence.   The first letter, addressed to "Pops," was to Reed's stepfather.  Reed begins by stating he is "sitting in county jail."  He goes on to explain that nobody is responding to his attempts to contact them.   Reed then requests that Pops take Jane Doe away, and that "The only reason were [sic] even going through this is cause my fuckin mom beat her for getting high with me."  He then explains that he needs help because they are trying to "3 strike me and give me 25 years."  Reed says: "I know I fucked up and should have been a more responsible adult.  It was like me and you sitting around getting high. We just got told on by my fuckin mom."  The letter concludes by saying that if Jane Doe was at Pop's house and nobody knew it, the prosecutor would have to strike a deal.

The second letter is to Reed's former girlfriend, Theresa.  Reed starts off saying he is unsure if he should write because the district attorney could get the letter and "twist[] my words around to make me look even worse."  He states that he did not mean for Jane Doe to get so high, and that he did not make her do anything and is facing 25 years.   He asks Theresa: "So would you please talk to her (Jane Doe) and tell her to tell these people all we did was get high and I pierced her belly button for her birthday on her request." Reed speculates that maybe the district attorney will understand how weak the case is and offer him five years.  He states that "it would be better yet if [Jane Doe] refuses to come

18

to court." Reed then talks about his daughters and their past relationship. He also talks about being in a cell 22 hours per day, and ends with "Please help me!!"

When Reed testified, he said that he never smoked methamphetamine with Jane Doe. The prosecution confronted him with his statement in the letter sent to his step-father. At that point, the court conducted a hearing in chambers. When testimony resumed, the prosecution asked Reed to review the letter to Pops to refresh his recollection. The prosecutor asked Reed whether he wrote: "My fucking mom beat her for getting high with me." Reed responded: "I wrote that, but I didn't write it as to—in the sense that she got high with me. I covered for her." The prosecution then quoted the portion of the letter that says: "I know I fucked up and should have been a more responsible adult. It was like me and you sitting around getting high. We just got told on by my fucking mom." Reed admitted that he wrote it but said it was not true. Again, he said: "I did not get high with her. I covered for her."

Later in his testimony, Reed denied piercing Jane Doe's belly button. The prosecutor introduced the statement from his letter to Theresa that states: "All we did was get high and I pierced her belly button for her birthday at her request." Reed responded: "That's what it says, but that's not what my mind was when I wrote that." On redirect, defense counsel did not ask Reed about the letters.

At the end of the day, the court memorialized the chambers discussion for the record. Defense counsel requested that the entire letter to Pops be read to the jury. Counsel argued that Reed's statements needed to be put in context and that the portions of the letter where he stated his concerns about his potential sentence could help do that. The court ruled that the two statements read from the letters were proper impeachment and probative of Reed's credibility. But Reed's request that his step-dad take Jane Doe to Florida so she could not testify was highly prejudicial and the court did not want it to be before the jury. In the letter to Reed's ex-wife, apart from the statement regarding belly button piercing, the letter "dealt with his sentence" and his request that Theresa try to get Jane Doe not to testify. The court found that the statement about the piercing was for specific impeachment and "you don't need the rest of the letter to explain that."

19

The People argue that Reed's claim has been forfeited for failure to make a timely objection because counsel did not seek to admit the letters until the close of Reed's case. But the issue is properly preserved for appellate review. Trial counsel filed a motion in limine prior to trial and sought to have the letters admitted during trial and at the close of the defense case.

"[A] trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming." (*People v. Pride* (1992) 3 Cal. 4th 195, 235, citing Evid. Code, § 352.) In *People v. Pride,* the defendant argued for admission of entire taped conversations of the interviews before his arrest. The trial court denied defendant's motion to play the tapes based on defendant's assertion that the tapes were necessary to illustrate his "state of mind." (*Ibid.*) The Supreme Court held that it was a reasonable inference that the court exercised its discretion and concluded the tapes would not materially assist the defense. (*Ibid.*)

Here Reed similarly argues that the complete letters show his state of mind and were necessary to the jury's understanding of the admitted statements. We disagree. Other than the portions introduced during trial, Reed's letter to his step-father is focused on his anticipated punishment saying the prosecution is going to "3 strike me and give me 25 years" and his request that his step-father secretly take Jane Doe out of state. The letter to Theresa similarly talks about facing 25 years in custody and the conditions of his confinement. He again states his desire that Jane Doe not testify, saying "it would be better if [Jane Doe] refuses to come to court." He seeks Theresa's help and requests she talk to Jane Doe and "tell her to tell these people all we did was get high and I pierced her belly button for her birthday [at] her request."

None of the other statements in the letters are necessary or relevant to the admitted statements and the court found the balance of the letters to be "highly prejudicial" because Reed wanted Jane Doe to be prevented from testifying. The trial court has the discretion to exclude evidence pursuant to section 356 if the evidence "does not serve to clarify or explain that which was admitted on direct testimony, or if the proponent of the evidence will not be seriously prejudiced by its exclusion." (*People v. Von Villas* (1992)

20

10 Cal.App.4th 201, 272.)  Further, statements in both letters discuss Reed's anticipated punishment and the fact he is in custody.  "A defendant's possible punishment is not a proper matter for jury consideration." (*People v. Holt* (1984) 37 Cal. 3d 436, 458.)

Reed argues that the entirety of the letters were important to allow the jury to understand the desperate nature of his pleas for help, and thereby understand that in context he was begging and scheming for help.  It is not at all clear to us how the excluded statements materially help Reed's cause in light of his testimony at trial.  Nevertheless, if Reed wanted to demonstrate his desperation and willingness to say anything in the letters to avoid conviction, his counsel was free to make such an argument.  Reed was on trial for five counts of committing a lewd act upon a child, aggravated sexual assault of a child by oral copulation and a foreign object, kidnapping to commit a lewd act, false imprisonment and providing methamphetamine to a minor.  It seems illogical that he needed the excluded statements from his letters to convince the jury of his desperation and willingness to say anything to avoid conviction.

The trial court did not abuse its discretion in barring admission of the entire content of the letters.  The admitted content was independently comprehensible and the full content of the letters did not materially assist the defense.

E.     Officer Genest's Expert Testimony

Reed argues that the trial court erred in allowing the police officer who originally interviewed Alexis L. to testify that child victims often delay reporting.  Reed contends this was improperly admitted Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony that required the court to give a limiting instruction.  The officer's testimony was not CSAAS testimony or, at most, was a limited version of CSAAS testimony and was restricted to his experience when interviewing child victims generally.  The court did not abuse its discretion in admitting the testimony.

Prior to trial, Reed moved in limine to exclude CSAAS evidence.  The prosecution stated that it might present testimony from officers if there was an "insinuation by cross-examination" that a victim did not behave as she was "supposed to."   The court instructed the prosecution to provide defense counsel with information about an officer's

21

training and experience before he or she would be allowed to testify to CSAAS. The court found that the testimony was "fair game" in these types of cases.

Officer Genest testified that in 1995 he was a patrol officer for the Ceres Police Department, and conducted the initial interview of Alexis L. about the molestation. In the initial interview, Alexis L. only discussed one incident: when Reed woke her in the night and masturbated while rubbing her hair. Officer Genest testified that in his 16 years of experience, it would often take several interviews for children to provide complete information. He stated that kids can be reserved and scared and may not recall all the information at first. Defense counsel objected that the testimony called for an opinion and was irrelevant. The court permitted the prosecution to establish a foundation. At that point, Officer Genest stated that he had been involved in 10 to 12 cases involving inappropriate touching of children. He took a week-long seminar about children's reaction to trauma and child sex crimes. The court ruled that Officer Genest had sufficient training and experience to answer questions about how children report trauma. Genest testified that it was not unusual for children to come forward years later to disclose abuse that they had never reported.

Defense counsel cross-examined Officer Genest and confirmed that he was never a sex crimes investigator. Genest testified that his exposure to sex crimes cases involved taking initial reports. He also testified that his knowledge would often come from following up with colleagues about the cases because he did not conduct the follow-up interviews.

A trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision is reviewed for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Watson* (2008) 43 Cal.4th 652, 692 (*Watson*) quoting Evid. Code, § 801, subd. (a).)

CSAAS is a syndrome with five stages: secrecy, helplessness, entrapment/accommodation, delayed disclosure, and denial. (*People v. Bowker* (1988)

203 Cal.App.3d 385, 389.) The use of CSAAS testimony at trial is limited to rebutting an attack on the credibility of the victim, explaining delays in reporting or debunking a myth or misconception about child victims. (*Id.* at p. 393–394.) "CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (*People v. Wells* (2004) 118 Cal.App.4th 179, 188 quoting *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301.)

Here, Officer Genest's testimony was not traditional CSAAS testimony that is more commonly provided by expert witnesses. His testimony was based upon his experience as a police officer conducting interviews with child victims in sexual assault cases.

In *People v. Dunnahoo*, two five-year-old victims did not immediately tell police officers they were sexually abused. At trial, the prosecution called two police officers, qualified as experts, who testified that it was not unusual for child victims to be reluctant to talk about their abuse. (*People v. Dunnahoo* (1984) 152 Cal.App.3d 561, 577.) Both officers testified that "a sexually molested child finds it quite difficult to talk about sexual indiscretions with an adult." (*Ibid.*) "The officers' testimony was admissible as opinion testimony by an expert witness pursuant to Evidence Code section 801 because the subject of child molestation and more particularly, the sensitivities of the victims, is knowledge sufficiently beyond common experience such that the opinion of an expert would be of assistance to the trier of fact." (*Ibid.*)

Similarly, in *People v. Tompkins*, a police investigator testified that victims of long-term child sexual abuse may have difficulty remembering and distinguishing specific incidents. (*People v. Tompkins* (2010) 185 Cal.App.4th 1253 (*Tompkins*).) One of the victims, who was molested by her father over a period of years, had been unable to recall the number of incidents and the details of the specific incidents. (*Id.* at p. 1264.) The police investigator testified that victims "block out the majority of what happened" and have difficulty distinguishing between incidents. Defense counsel objected and the prosecution questioned the investigator about his expertise. The officer testified that he had been involved in many child molestation investigations over his ten years in law

23

enforcement and had been present during interviews with molestation victims conducted by child investigation specialists. (*Id.* at pp. 1264–1265.) He had also taken a 40-hour course in the investigation of sex crimes against children. (*Id.* at p. 1265.) The *Tompkins* court held that even though the investigator did not have extensive academic credentials, he had substantial experience as a child sexual abuse investigator. (*Ibid.*) Any question about the degree of his knowledge went to the weight rather than the admissibility of the evidence and the trial court did not abuse its discretion in admitting the testimony. (*Ibid.*)

Here, after Reed objected to Officer Genest's testimony, the prosecution elicited his qualifications. Like the officer in *Tompkins*, Genest had been in the department for a substantial period of time (16 years) and while he had not investigated a large number of cases, he had been involved in 10-12 cases involving the sexual abuse of children. He had also attended a 40-hour training on child sex crimes and children's reaction to trauma. He further explained that although he did not conduct follow-up interviews, he would discuss them with his colleagues. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1121–22. [In providing expert testimony, a gang expert may rely "on his or her personal investigations of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies."].)

The trial court did not abuse its discretion in admitting the testimony and the jury could properly weigh it in light of Reed's cross-examination about Officer Genest's qualifications. Given the nature of Officer Genest's testimony the court was not required to sua sponte give a limiting instruction on the use of CSAAS evidence. (But see *People v. Housley* (1992) 6 Cal.App.4th 947, 958–959 [requiring court's to provide a limiting instructing when CSAAS evidence is introduced].)

### *Ineffective Assistance of Counsel*

Defense counsel objected to Officer Genest's testimony at the time it was elicited and the court allowed the prosecution to establish Officer Genest's qualifications. The court ruled that Officer Genest had sufficient qualifications to answer questions. Defense counsel did not lodge any further objection. Reed now claims this constituted ineffective assistance of counsel. As outlined above, Reed must demonstrate both counsel's

24

ineffectiveness and prejudice. "[A] mere failure to object to evidence seldom establishes counsel's incompetence." (*People v. Malone* (1988) 47 Cal.3d 1, 33.) Officer Genest was qualified to testify and the depth of his experience with child sex crime investigations went to the weight rather than the admissibility of his testimony. Counsel, therefore, was not ineffective for electing not to renew his objection when it appears from the record he made the tactical decision to cross-examine Officer Genest about his limited experience.

### Harmless Error

The harmless error standard from *People v. Watson* applies to the trial court's decision to allow officer Genest to testify on CSAAS. In conducting a review pursuant to *Watson*, we evaluate whether it is "reasonably probable" that a result more favorable to the defendant would have been reached in the absence of error. (*People v. Jandres, supra*, 226 Cal.App.4th at p. 360 citing *Harris, supra,* 60 Cal.App.4th at p. 741.)

Even if the trial court erred in admitting Officer Genest's testimony, any such error was harmless. (*People v. Archer* (1989) 215 Cal.App.3d 197, 206–207 [any error in the admission of child sexual abuse accommodation syndrome testimony was harmless in light of ample evidence of the defendant's guilt].) The evidence against Reed was substantial including Jane Doe's testimony as well as her videotaped interview and the testimony of both the doctor and sexual assault nurse to the severity and unusual nature of Jane's injuries. There was also substantial physical evidence including Jane's blood and Reed's sperm and DNA on the towel found in the washing machine at the Bonnie Lane home, the broom handle and one missing glove, Reed's DNA on Jane's nipple. The jury was also presented with Reed's letters from jail stating he smoked methamphetamine with Jane and with the propensity evidence from Alexis L. and Celia M.

Moreover, in considering Officer Genest's testimony, it was limited to discussion of child victims as a class and related to his experience with Alexis L. rather than Jane Doe. (See *People v. Tompkins, supra*, 185 Cal.App.4th at p. 1266.)

Reed identifies one reference to Officer Genest's testimony in the prosecutor's closing argument that he says is prejudicial: "She stated that after Reed gave Jane Doe

25

the massage, she did not tell anyone. And you remember Officer Genest from Ceres P.D., the officer from 1995 who said children react differently. Some people never say anything, and they come and report when they're adults. Others let out a little bit at a time. Others report right away. It just depends on the child." In his closing argument, defense counsel referenced the prosecutor's statement that "children don't always say right away" and then asked: "do we have any basis in psychology or any sort of expert testimony to that effect. We don't." The prosecutor objected that counsel had misstated the facts in evidence and the court instructed the jury that statements of counsel are not evidence and they should rely on their own recollections of the evidence. No matter. It is not reasonably probable that Reed would have received a more favorable verdict absent the introduction of Officer Genest's testimony and the brief reference to it in closing argument.

F.      Jury Instruction on Consciousness of Guilt

During trial, the court stated that it planned to give CALCRIM No. 371, over Reed's objection, regarding consciousness of guilt because there was an inference that Reed may have "gotten rid of some evidence." The prosecutor added that there was also evidence that Reed told Jane Doe to shower before he took her home which demonstrated an attempt to hide the sexual assault. The court instructed the jury: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

The facts giving rise to an inference of consciousness of guilt do not need to be conclusively established for the court to give an instruction, " 'there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. [Citations.]' " (*People v. Alexander* (2010) 49 Cal.4th 846, 921–922 quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

Reed contends that the instruction supported an inference of "global guilt" of all crimes and was irrational and unfair. The court's instruction, however, carefully

instructed the jurors that if they concluded Reed attempted to hide evidence then they must decide its meaning and importance and that such an attempt "cannot prove guilt by itself."

There was sufficient evidence before the jury to warrant the instruction. Jane Doe testified that Reed instructed her to "rinse off" in the shower before he took her home to her grandmother. The jury could infer that Reed wanted her to wash any of his bodily fluids from her body and to remove any of her own blood. The jury also heard testimony that the police search team found a damp towel in the washing machine that appeared to have blood on it. The jury could infer that Reed had attempted to wash the towel to conceal evidence from the assaults. (See *People v. Tate* (2010) 49 Cal.4th 635, 698–699 [consciousness of guilt instruction was proper where a defendant charged with first degree murder had attempted to throw away his blood-stained socks and wash the suit he was wearing on the day of the murder]; *People v. Richardson* (2008) 43 Cal.4th 959, 1020 [upholding instruction where defendant had attempted to conceal evidence of drawings by the 11-year-old victim that had defendant's nickname on them showing that he had been a recent visitor to the murder victim's residence].)

Moreover, the officers did not find two items described by Jane Doe: (1) the sheet for the inflatable air mattress where one of the assaults occurred and (2) a pornographic video. The jury could infer Reed had hidden or destroyed these items. (See *People v. Williams* (1996) 46 Cal.App.4th 1767, 1780 [where police searched defendant's apartment and found some clothing worn by defendant during alleged attacks but could not find shoes and shorts worn by him that day; it was reasonable to assume he hid them to thwart efforts to identify him and consciousness of guilt instruction was properly given].)

G.    Reasonable Doubt Instruction

The jury was instructed that a defendant is presumed innocent and the prosecution must prove him guilty beyond a reasonable doubt. "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. In deciding whether the People have proved their case beyond a reasonable doubt, you must

27

impartially compare and consider all the evidence that was received throughout the entire trial. [¶] Unless the evidence proves the defendant . . . guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

Reed contends that the trial court's instruction pursuant to CALCRIM No. 220 denied him due process and a fair trial. His first objection is to language in the standard instruction—that the jury must rely on evidence presented in court—that was not given in this case. Reed's second objection is to the "abiding conviction" language. He argues "recognizing California court[s] hold to the contrary" but "for purposes of exhausting state remedies, that the archaic and incomplete abiding conviction language set forth in CALCRIM No. 220 constitutes reversible per se structural error by conveying an insufficient standard of proof akin to clear and convincing evidence and going only to jurors' duration of belief in guilt, not their degree of certainty." But, as Reed admits, California courts hold to the contrary, in reliance on *People v. Freeman* (1994) 8 Cal.4th 450. (See, e.g., *People v. Campos* (2007) 156 Cal.App.4th 1228, 1239 ["[t]he Courts of Appeal in every appellate district have also consistently rejected similar claims"].) We see no reason to revisit the issue.

H.      Cumulative Error

We have rejected Reed's arguments that errors occurred during his trial. Accordingly, we reject his contention that the cumulative effect of the errors requires reversal. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

I.      Sentencing

At sentencing, the prosecution requested that Reed receive consecutive sentences on all applicable counts. Reed argued that under Penal Code section 654, "there's no evidence or any testimony of any break" in the conduct. Reed argued that the sentence advocated by the People of 500 years to life "makes no sense" and it was a sentence without meaning amounting to "over kill." The court found that counts one, two, three, five, six, seven, eight, ten and thirteen were separate and distinct acts. "They were not only different sexual conduct and acts and offenses, but they were in different room[s], in different positions, we went from the living room, to the bedroom, to the shower, back

28

out to the living room." The court concluded there was "ample opportunity for a person to reflect and to take a break" so it was not one continuous act. The court then ordered each of the 50 years to life sentences on counts one, three, five, six, seven, eight, ten and thirteen to be served consecutively for a term of 450 years to life. For nine of the counts, the court added a mandatory term of five years consecutive for a total of 45 years to increase the total indeterminate term to 495 years to life. The court also imposed a determinate sentence of 19 years, 4 months for counts 11 and 12 to be served before Reed began the indeterminate term.

1. Sentencing on Counts Two and Four

Reed contends that the court improperly imposed separate terms under Penal Code section 654 for count two (kidnapping with the intent to commit child molestation) and count four (assault with the intent to commit a lewd act on a child).

Penal Code section 654 prohibits separate punishment for two offenses arising from the same act or from an indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207–1208.) Section 654 "does not preclude charging and convicting a defendant for multiple *violations* based on different acts, but rather prohibits multiple *punishments* for an indivisible course of conduct that is punishable in different ways." (*People v. Elsey* (2000) 81 Cal.App.4th 948, 958.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Latimer, supra*, at p. 1208.)

Reed may raise the applicability of section 654 on appeal even if no objection was made in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)

For count two, Reed argues the kidnapping count was based on his "luring of Jane Doe into the house" in order to commit the other crimes. He also contends, in passing, that the court erred in imposing separate terms for all of the lewd act and sexual assault counts.

29

In *People v. Bradley* the court upheld separate punishments for kidnapping and assault with the intent to commit rape where the defendant moved the victim approximately 60 feet from the street to a dumpster where he kissed and touched her. (*People v. Bradley* (1993) 15 Cal.App.4th 1144, disapproved on another ground in *People v. Rayford* (1994) 9 Cal.4th 1, 884.) Bradley's conduct included forceful taking, forceful movement and assault with the intent to commit rape. While this all had the general objective of sexual gratification, the kidnapping was a separate act from the assault. (*Id.* at p. 1158.) "To combine these acts into an indivisible course of conduct under one broad-based objective of Bradley's sexual gratification, would reward him for his greater criminal ambition." (*Ibid.*) Bradley's objective in moving the victim was separate from his later objective in assaulting her and he may be punished for each separately. (*Ibid.*; see also *People v. Harrison* (1989) 48 Cal.3d 321, 326, 336 [upholding separate punishments for three acts of sexual penetration over the course of less than 10 minutes where "each of defendant's 'repenetrations' was clearly volitional, criminal and occasioned by a separate act of force."] italics omitted; *People v. Perez* (1979) 23 Cal.3d 545 [Penal Code section 654 did not preclude separate punishments for rape, sodomy and two oral copulation counts committed during a 45-to-60 minute attack].)

Here, Reed lured Jane into his home by telling her he needed to use the bathroom or get a drink of water. He did not sexually assault her immediately upon entering the home. They sat in the living room and he offered her methamphetamine. Reed did not engage in his first sexual assault until Jane had passed out on the couch. He then assaulted her in various ways in different locations in the house: he first orally copulated her on the couch, then he attempted to have intercourse with her on the floor, then he attempted to have intercourse with her in the bathroom and to force her to orally copulate him in the bathroom, and then he assaulted her with the broom handle. After each attempt, Reed "voluntary resumed his sexually assaultive behavior." (*People v. Harrison, supra,* 48 Cal.3d at p. 336.) As the trial court found, these were separate and distinct acts where Reed had "ample opportunity . . . to reflect and to take a break." " 'A person who commits separate, factually distinct, crimes, even with only one ultimate

intent and objective, is more culpable than the person who commits only one crime in pursuit of the same intent and objective." (*People v. Correa* (2012) 54 Cal.4th 331, 341 quoting *People v. Latimer, supra,* 5 Cal.4th at p. 1211.)

A "defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*People v. Harrison, supra,* 48 Cal.3d at p. 336.) Here, Reed committed multiple acts of escalating violence against Jane Doe. This warranted separate punishment for each count. This "conclusion . . . is consistent with a line of cases holding that a trial court may impose consecutive sentences for multiple different sex offenses committed against the same victim within a short period of time." (*People v. Clair* (2011) 197 Cal.App.4th 949, 961, citing *People v. Perez* (1979) 23 Cal.3d 545, 551.)

On count four, assault with intent to commit a lewd act on a child, the court did not impose a separate, consecutive term. Instead, the court imposed a concurrent term of six years because it was not clear "where the jury found the assault and what crimes." The court should have stayed execution of this sentence rather than impose it concurrently and we order the judgment modified to stay execution of the six year term for count four. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 [to implement Penal Code section 654, the trial court must impose sentence on all counts, but stay execution of sentence as necessary to prevent multiple punishment]; Cal. Rules of Court rule 4.424.) This has no impact on Reed's total sentence.

2.      Cruel and Unusual Punishment

Reed contends that his sentence constitutes cruel and unusual punishment under both the United States and California Constitutions. Reed failed to raise the issue in the trial court, so it has been forfeited. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) In any event, even if Reed had properly preserved the issue, it would fail on the merits.

A punishment violates the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the

crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.) "[I]n California a punishment may violate article I, section 6, of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Under *Lynch* we examine (1) the nature of the offender, (2) compare the punishment with the penalty for more serious crimes in the same jurisdiction, and (3) compare the punishment with the penalty for more serious crimes in other jurisdictions. (*Id.* at pp. 425–427.)

Reed's sentence was controlled by Penal Code sections 667.61 and 667.71 which impose harsher sentences on violent sex offenders. (*People v. Mancebo* (2002) 27 Cal.4th 735, 741.) Reed was convicted of 13 felonies involving sex crimes committed against his 13-year-old niece. Reed provided Jane Doe with methamphetamine and then repeatedly sexually assaulted her in various ways. Reed had an extensive criminal history that included prior sexual violence against other young girls. Reed exhibited no remorse and blamed Jane Doe for her injuries.

Reed compares his sentence to someone convicted of first degree murder and asserts that his sentence is unconstitutionally disproportionate but he fails to recognize that he was not convicted of one but rather 13 felonies. "[T]he commission of a single act of murder, while heinous and severely punished, cannot be compared with the commission of multiple felonies." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 826.) The prosecution identifies cases with similar sentences for sexual assault that have been upheld on appeal. (See *People v. Cartwright* (1995) 39 Cal.App.4th 1123 [upholding indeterminate term of 375 plus a determinate term of 53 years for sexual assault charges; *People v. Wallace* (1993) 14 Cal.App.4th 651 [rejecting a cruel and unusual punishment challenge to a sentence of 283 years, 8 months for sexual assaults on multiple victims]; *People v. Retanan* (2007) 154 Cal.App.4th 1219 [upholding sentence of 135 years to life against a cruel and unusual punishment challenge for defendant's sexual assaults of three young girls]; see also *People v. Alvarado* (2001) 87 Cal.App.4th 178 [upholding a life

term for rape committed during a burglary against a challenge the sentence was cruel and unusual punishment].)

Reed contends that California's sentencing scheme is the harshest in the nation, but admits: "Several other jurisdictions in theory authorize similar sentences." "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.) The sentencing scheme "merely reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims. It does not, however, render a defendant's sentence excessive as a matter of law in every case." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200–201.)

Reed is a recidivist, violent sexual offender. His sentence represents a cumulative punishment resulting from the commission of numerous offenses on multiple victims. He has failed to show his sentence is disproportionate to sentences for other recidivist child molesters. Reed has failed to demonstrate that his sentence is so disproportionate to his crimes that it shocks the conscience or offends fundamental notions of human dignity. (See *People v. Dillon* (1983) 34 Cal.3d 441, 477–478.)

## DISPOSITION

The judgment is modified to reflect that the six year term on count four is stayed. As modified, the judgment is affirmed.

                                        _____
                                        Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Pollak, J.